IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

KENNY GIPSON                                                   PLAINTIFF

vs.                      NO. 3:19-CV-03050-TLB

BRIAN DAVIS, Individually and in his
Official capacity as an employee of the
Baxter County Sheriff's Department;
MIKE HOLLAND, Individually and
in his Official capacity as an employee
of the Baxter County Sheriff's Department;
JOHN MONTGOMERY, Individually
and in his Official capacity as the Baxter
County Sheriff; and the BAXTER COUNTY,
ARKANSAS                                            DEFENDANTS

**PLAINTIFF'S RESPONSE TO STATEMENT OF
INDISPUTABLE MATERIAL FACTS IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, by and through his attorney, John Ogles, and for his Response to Defendants' Statement of Indisputable Material Facts in Support of Motion for Summary Judgment states:

**Brenda Gipson's 911 Call**

1. On September 6, 2018, at approximately 10:37 a.m., the Plaintiff's mother, Mrs. Brenda Gipson, called 911 to report an emergency at her home at 26 Justin Lane in Mountain Home, Arkansas. Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Denied. There was no "emergency." Mrs. Gibson asked the 911 operator to send medical help for Plaintiff for ongoing substance abuse problems, not an

1

emergency.

2. On her 911 call, Mrs. Gipson reported that her son, Plaintiff Kenny Gipson, who she reported as having "mental and drug problems," had just been "caught...huffing air in his room." Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Admitted.

3. On her 911 call, Mrs. Gipson further reported that she needed "some help;" when asked whether she needed an ambulance or an officer, she replied: "Well, maybe both." Mrs. Gipson went on to explain that her son could "get belligerent." Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Denied as written. Mrs. Gipson only agreed that an officer may be required when she was told the ambulance could not come until the scene was safe and secure.

4. After hearing Mrs. Gipson's report, the initial dispatcher transferred Mrs. Gipson to "ambulance dispatch." When that dispatcher asked what was going on, Mrs. Gipson explained that her son, Plaintiff Gipson, who she again described as suffering from "mental" and "drug abuse problems," had been "caught huffing air" and she had tried to take the air can from him, but had failed because, in Mrs. Gipson's words, he was "getting kind of belligerent." Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Denied. Mrs. Gipson never said she was unable to take the air can from Plaintiff because he was belligerent. Both she and Plaintiff testified in their depositions that Plaintiff was not belligerent, and Mrs. Gipson was not the least bit afraid

for her safety.

5. When the ambulance dispatcher asked Mrs. Gipson if the Plaintiff was "violent," Mrs. Gipson responded that the Plaintiff "gets real agitated," a word she used to describe the Plaintiff more than once. Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Denied. Mrs. Gipson did indeed state Plaintiff can get agitated, but Defendants seem to suggest that state of mind equates to a dangerous situation, which is not true.

6. In response to Mrs. Gipson's report, the ambulance dispatcher explained that law enforcement would have to appear at the scene first in order to ensure that everything was safe. Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Admitted.

7. Mrs. Gipson also told the ambulance dispatcher that she was calling from her car in the driveway, where she had retreated after her confrontation with the Plaintiff, because she didn't want the Plaintiff to hear her call, but that she needed them to come because she had "dealt with this too long." Ex. 1, Montgomery Affidavit, 911 Audio.

RESPONSE: Denied.   There was no "confrontation" with the Plaintiff.   Mrs. Gipson did not "retreat."    She had left the house, had gotten in the car to go somewhere and after leaving decided to come back to deal with her son's chemical abuse problem by having him admitted to the local hospital for treatment.

**Use of Force by Deputies Holland & Davis**

8. In response to Mrs. Gipson's 911 call, Sgt. Brian Davis of the Baxter County

3

Sheriff's department was dispatched to 26 Justin Lane in Mountain Home, Arkansas, to provide assistance to an ambulance crew. This was not an uncommon call, as the ambulance crews often request police assistance in securing a scene where there is a reported or perceived threat to the crew's safety. Ex. 2, Davis Affidavit.

    RESPONSE: Admitted.

    9. When Sgt. Davis arrived at the Plaintiff's residence, he was met by the 911 caller, Mrs. Gipson. She told Davis that her 47-year-old son, Kenny Gipson, was in his bedroom huffing air and was being very aggressive toward her when she was trying to get it from him. Ex. 2, Davis Affidavit.

    RESPONSE: Denied. Mrs. Gipson never characterized Plaintiff's actions as "aggressive." Both Plaintiff and Mrs. Gipson testified Plaintiff was never aggressive to his mother. Officer Holland admitted Plaintiff has been very docile his entire life.

    10. Mrs. Gipson told Sgt. Davis that she was afraid her son was going to kill himself if she didn't get help, but that she was also afraid that he would be angry about her calling us and that he might be aggressive for that reason. Ex. 2, Davis Affidavit.

    RESPONSE: Denied.

    11. Mrs. Gipson led Sgt. Davis to her son's room, where he was sitting on his bed with a can of air duster in his hand. Mrs. Gipson's mother tried to get the can from him, but he was very aggressive toward her, so she backed away. Ex. 2, Davis Affidavit.

    RESPONSE: Denied as to Plaintiff being "very aggressive" toward his mother. It is admitted Plaintiff would not allow his other to take the can away from him.

4

12. After his mother tried, unsuccessfully, to take the can from him, Plaintiff Gibson huffed the can another 6 or 8 times, as Sgt. Davis tried to talk him into giving up the can. Davis told Plaintiff Gipson that he was going to kill himself and the Plaintiff told Davis that he knew and that he was trying to do that. Ex. 2, Davis Affidavit.

RESPONSE: Denied as to any statements Plaintiff intended to kill himself. Plaintiff admits he agreed with Sgt. Davis' statement that huffing could, in fact, lead to death.

13. Each time Plaintiff Gipson would huff from the can, he would nearly pass out and then come back, each time more angry. Sgt. Davis tried to take the air can from Plaintiff Gipson several times, but he wouldn't give it up. Ex. 2, Davis Affidavit.

RESPONSE: Denied as to Plaintiff becoming more angry each time he "huffed." "Huffing" does not generally make a person angry.

14. The last time Plaintiff Gipson huffed from the can, Sgt. Davis waited until he was almost passed out and quickly snatched the can from him. When Plaintiff Gipson came around, he was very angry that Davis had taken the can from him. Ex. 2, Davis Affidavit.

RESPONSE: Denied as to Plaintiff being "very angry." It is admitted Plaintiff was not pleased by Davis' actions as he did not want to stop "huffing" at that time.

15. Plaintiff Gipson's mother talked about taking him to the hospital and he said he wasn't going to do that, so Sgt. Davis told Plaintiff Gipson that he was either going to the hospital or going with the officers (i.e., under arrest, as Deputy Mike Holland had

5

arrived at that point), to which Plaintiff Gipson replied: "And that was a surprise." Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Admitted, except no one at the scene ever suggested Plaintiff was under arrest. In fact, Davis repeatedly testified he never placed Plaintiff under arrest or told Plaintiff he was under arrest. Holland testified to the same. Both said Plaintiff was being "detained," which they perceive to be different than placing Plaintiff "under arrest."

16. After Sgt. Davis told Plaintiff Gipson that he was going to the hospital or with the officers, Plaintiff Gipson jumped up off the bed and went past Sgt. Davis and then proceeded past Deputy Holland. Sgt. Davis and Deputy Holland to stop Plaintiff Gipson and Holland tried to do so, but Plaintiff Gipson pushed Holland away, swinging at him in the process, and told Holland to get his hands off of him. Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Denied. Plaintiff did not: (1) "jump" off the bed; (2) push Holland; or (3) swing at Holland. Neither officer made any effort to stop Plaintiff inside the home. Mrs. Gipson testified that as Plaintiff got up from his bed he made the comment he would go to the hospital. Neither officer said a word to Plaintiff as he walked out of the bedroom and through the house to the door to the garage.

17. After physically pushing Holland, Plaintiff Gipson went into the garage and headed quickly (he went into sort of a quick jog) in the direction of the street, refusing to stop despite repeated commands from Davis and Holland. Ex. 2, Davis Affidavit; Ex. 3,

6

Holland Affidavit.

RESPONSE: Denied. Plaintiff did not push Holland, he was walking at a normal pace, and neither Davis or Holland made any "repeated" demands for him to stop. Both have admitted they utilized their tasers, without any warning, as their first option for stopping Plaintiff from walking away from them.

18. In light of the emergency risks inherent in the situation (with a clearly impaired and expressly suicidal person heading toward a vehicle and/or the street with no other option to stop him before he reached one of those, since he had too big a lead and was now moving too quickly for us to catch up on foot) and believing that they had probable cause to arrest the Plaintiff (at least for huffing air in our presence and assaulting Deputy Holland, if not for fleeing), both Sgt. Davis and Deputy Holland separately and independently deployed their tasers and the prongs struck Plaintiff Gipson in the back. Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: It is admitted both officers tased Plaintiff at the same time. The remainder of this paragraph is denied. Plaintiff was not fleeing; he was going outside to wait for the ambulance which he knew was soon to arrive. Davis and Holland had several other options, according to county policies and their training materials, but they chose using tasers as it was easier.

19. Unbeknownst to each other and without any coordination between them, Sgt. Davis and Deputy Holland, both law enforcement veterans with decades of experience, assessed the situation in the same manner and made the same split-second decision,

7

deploying their tasers at exactly the same time. Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: It is admitted both officers deployed their tasers at maximum power and for the maximum time, at the same time, resulting in Plaintiff being subjected to 100,000 volts for five seconds. The rest of this paragraph is denied. Further, had either officer followed their training materials, which required them to warn Plaintiff they were about to use their tasers, both would have not used their tasers at the same time, as doing so is prohibited and exceptionally dangerous, increasing the voltage going through Plaintiff's body from 50,000 volts to 100,000 volts.

20. The events described above, from Plaintiff Gipson getting up from his bed to the time he was tased, took only a few brief seconds and the officers' separate and independent decisions to deploy their respective tasers were, in a very literal sense, split second decisions. Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Denied. One cannot walk from the bedroom, through a hallway, through the kitchen, through the garage and 10 to 15 feet down the driveway in "few brief seconds."

21. When the taser prongs struck Plaintiff Gipson, he performed (involuntarily) a nearly complete 180 degree turn and fell backwards, hitting the driveway with his back and the back of his head. Neither Sgt. Davis nor Deputy Holland has ever seen another subject tased in the back turn in such a manner and fall backward (or any other way other than to their knees and down forward in their direction of travel). Likewise, neither

officer has ever seen a tased subject injured like Plaintiff Gipson. To the contrary, the normal injuries from tasing a subject in the field are superficial scrapes and bruises, even when they are tased while running, like Plaintiff Gipson. Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Denied as written. Further, the officer's training materials expressly provide a person who is moving should not be tased because of the risk of injury.

22. Because of the way he fell, Plaintiff Gipson hit the back of his head quite hard on the driveway. He was out of it until the paramedics arrived. The paramedics woke him up and, when they did, he resisted the officers quite vigorously and it took four deputies and a paramedic to restrain him while the paramedic administered multiple doses of a sedative. When he finally calmed down due to the sedatives, he was transported by ambulance to Baxter County Regional Medical Center.

RESPONSE: Denied as written. One of the paramedics explained that the procedure used to awaken Plaintiff causes excruciating pain, a natural reaction to which is to get away from the source of that pain.

23. The relevant taser download records indicate that both Sgt. Davis and Deputy Holland deployed their tasers only once on September 6, 2018, for 5 seconds (that is a full cycle, after which the taser automatically stops the electrical pulse).

RESPONSE: Admitted.

**Training, Supervision & Policies**

24. Both Sgt. Davis and Deputy Holland have been specifically trained in the use of the taser, which includes taking a taser strike. Based on that training, which is the same training provided to officers across the state and around the country, both Davis and Holland are certified to carry and use a taser. Ex. 1, Montgomery Affidavit; Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Denied as written. It may be true the officers have been certified, but their training must have been deficient because they failed to follow it in several important ways, including: (1) always warn the person they are about to be tased; (2) never have two officers use their tasers at the same time; (3) do not tase a person who is moving; (4) seldom, if ever, use a taser on someone who is in an agitated state, intoxicated on drugs, known to be a drug abuser or has psychological problems.

25. Both Sgt. Davis and Deputy Holland have also completed the full "police academy" course at the Arkansas Law Enforcement Training Academy (ALETA), which includes emergency medical and response training (e.g., CPR) and use of force training. Both have also been trained in the policies of the Sheriff's department. Ex. 1, Montgomery Affidavit; Ex. 2, Davis Affidavit; Ex. 3, Holland Affidavit.

RESPONSE: Denied as written. They may have received certificates, but see response to No. 24 above concerning the officers' lack of training.

26. Sheriff John Montgomery necessarily delegates responsibility for most day-to-day activities to subordinate officers through a chain of command in each division of the Sheriff's department. Those officers are expected to perform those day-to-day

tasks pursuant to policies he has implemented for the department. This chain of command, in addition to other mechanisms like post-incident investigations, citizen complaint procedures, and other mechanisms, also provides for the comprehensive supervision of Sheriff's office employees. Ex. 1, Montgomery Affidavit.

RESPONSE: Denied as written.

27. Baxter County has constitutionally appropriate policies in place to govern the use of force, including policies on the use of tasers, by deputies.

RESPONSE: Denied. It may be true that policies are in place, but as a matter of practice officers, or at least both Davis and Holland, ignore them. The sheriff either knows that to be true and chooses to do nothing, or he takes an "ignorance is bliss" attitude toward his duties to supervise and train his officers.

John Ogles
Ogles Law Firm, P.A.
Arkansas Bar No. 89003
Texas Bar No. 00797922
200 S. Jeff Davis
PO Box 891
Jacksonville, AR 72078
501-982-8339
Facsimile 501-985-1403
jogles@aol.com